IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| MARTIN ANDERSON, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | 10 C 3328 |
| | ) | |
| CARMEN IACULLO and ILLINOIS | ) | Judge Virginia M. Kendall |
| DEPARTMENT OF TRANSPORTATION | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Martin Anderson brings this suit against Defendant Carmen Iacullo and the Illinois Department of Transportation ("IDOT"), alleging that Iacullo caused the termination of his employment at IDOT based on his political affiliation in violation of the First Amendment (Count I). Specifically, Anderson alleges he was fired from his position as the head of the Electrical Design Section in IDOT's District 1 because he was not a political supporter of Iacullo, IDOT's Acting Engineer of Operations. In Count II of his First Amended Complaint, Anderson seeks a petition for writ of certiorari under Illinois common law to review IDOT's decision to terminate him. Defendants move for summary judgment on both counts. For the reasons stated herein, Defendants' Motion for Summary Judgment with respect to Count I is granted. As Count I represents the sole basis for this Court's federal jurisdiction, the Court exercizes its discretion not to assert supplemental jurisdiction and therefore dismisses COunt II.

## STATEMENT OF MATERIAL UNDISPUTED FACTS[1]

### I.     The Parties' Noncompliance with Local Rule 56.1

As a preliminary matter, the Court notes that both parties have failed to comply with

Local Rule 56.1 for the Northern District of Illinois.   First, throughout his Response to

Defendants' 56.1 Statement of Facts, Anderson states that the Defendants' assertions are

"undisputed" but "incomplete." (*See* Pl. 56.1 Resp. ¶¶ 10–11, 13, 26, 48, 53–54).   In response to

these assertions and others, Anderson then proceeds to submit additional facts of his own. (*See*

*id*; *see also* Pl. 56.1 Resp. ¶¶ 3, 12, 19, 23, 25, 36, 39, 52, 74.)   As this Court has previously

stated:

> Using such evidence to directly dispute [the Defendant's] facts is
> fine, but to be considered as facts affirmatively demonstrating why
> summary judgment should be denied, [the Plaintiff's] evidence
> must also appear in [his] statement of additional facts under the
> local rules …. Putting this evidence in the statement of additional
> facts is necessary because [the Defendant] has no mechanism to
> 'reply' to [the Plaintiff's] responses to [the Defendant's] facts and
> thereby dispute the contentions raised in [the Plaintiff's] responses.

*Woods v. Von Maur, Inc.*, 837 F.Supp.2d 857, 863 (N.D. Ill. 2011) (citations omitted).

Accordingly, any additional assertions of fact contained in Anderson's response to Defendants'

Rule 56.1 Statement that do not directly dispute Defendants' facts will be ignored. *See Cracco v.*

*Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) ("Because of the important function local

rules like Rule 56.1 serve in organizing the evidence and identifying disputed facts, we have

consistently upheld the district court's discretion to require strict compliance with those rules.");

---

[1] Throughout this Opinion, the Court refers to the Parties' Local Rule 56.1 Statements of Undisputed Material Facts as follows: citations to Defendants' Statement of Facts (Dkt. 76) have been abbreviated to "Def. 56.1 St. ¶ __"; citations to Anderson's Statement of Material Fact (Dkt. 90) have been abbreviated to "Pl. 56.1 St. ¶ __"; citations to Defendants' Response to Anderson's Statement of Facts (Dkt. 100) have been abbreviated to "Def. 56.1 Resp. ¶ __"; and citations to Anderson's response to Defendants' Statement of Facts (Dkt. 89) have been abbreviated to "Pl. 56.1 Resp. ¶ __."

*see, e.g.*, *Chatman v. Vill. of Oak Park*, No. 07 C 0625, 2008 WL 516880, at *1 (N.D. Ill. Feb. 21, 2008) (additional facts included as part of plaintiff's support for disputing proposed facts are not considered because they are not presented in compliance with Rule 56.1(b)(3)(B)).

Next, any assertions contained in Defendants' "Reply" to Anderson's Response to Defendants' Statement of Facts (Dkt. 101) are not properly before the Court. While Anderson is permitted to file a response to Nationwide's statement of additional facts, *see* L.R. 56.1(a), "nowhere does the rule state that a movant may reply to the responses of a non-movant." *Hudgens v. Wexler and Wexler*, 391 F.Supp.2d 634, 637 (N.D. Ill. 2005). Thus the Court will not consider the "unnecessary and improper 'replies' to [Anderson's] responses." *Id.* (citing *Shulz v. Varian Med. Sys., Inc.*, 315 F.Supp.2d 923, 925 n.1 (N.D. Ill. 2004) (Castillo, J.) ("Such a reply is inappropriate"); *accord Kozlowski v. Fry*, 238 F.Supp.2d 996, 1000 n. 2 (N.D. Ill. 2002) ([S]uch a submission by Defendants is neither appropriate nor necessary under the Local Rules.").

## II.    The Parties' Employment with IDOT

Martin Anderson began working for IDOT in 1985 as the Contract Plans unit chief in the Bureau of Electrical Operations. (Def. 56.1 St. ¶¶ 1–2.) In 1990, Anderson became a Technical Manager VII, serving as Bureau Chief of the Bureau of Electrical Operations – an upper management position. (*Id.* ¶ 2.) The State of Illinois designates certain, limited state employment positions as "*Rutan*-exempt." (Complaint, ¶ 13.) This designation stems from the Supreme Court's decision in *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990), in which the Court held that the First Amendment forbids government officials from discharging public employees solely for not being supporters of the political party in power unless party affiliation is an appropriate requirement for the position involved. *Id.* at 64. If a position is *Rutan*-exempt,

3

the State may lawfully make decisions regarding the hiring, promotion, transfer, or recall from layoff for the position based on political affiliation or support because the position is either a confidential or policymaking position. *Id.* For all positions other than *Rutan*-exempt positions, the State of Illinois, including IDOT, is prohibited from hiring, promoting, transferring, terminating, laying off, or recalling from layoff, any person on the basis of political affiliation or support. (*Id.* ¶ 14.) Anderson's position was designated as "non-*Rutan* exempt" by the State of Illinois, meaning the Defendants were prohibited from basing any employment decisions regarding Anderson on his political affiliation or support for a particular political party or faction. (*Id.* ¶¶ 15–16.)

Defendant Carmen Iacullo began working for IDOT in 2004 as an Assistant to the District 1 Engineer. (Def. 56.1 St. ¶ 3.) Prior to working for IDOT, Iacullo worked for the City of Chicago, first for the Department of Streets and Sanitation from 1975 to 1989 and then for the Chicago Department of Transportation from 1989 to 2004. (Pl. 56.1 St. ¶ 1.) In 2004, Iacullo learned that there may be a position available to him at IDOT from Timothy Martin, then-Secretary of Transportation for the Blagojevich Administration. (Pl. 56.1 St. ¶ 3.) Iacullo and Martin knew one another because they had worked together at the Chicago Department of Transportation from 1989 to the mid-1990s. (*Id.*) Martin was one of the three individuals who interviewed Iacullo for his position at IDOT. (*Id.* ¶ 4.) When IDOT hired Iacullo, the position of Assistant to the District Engineer was a vacant position that no one had occupied for a several years. (Pl. 56.1 St. ¶ 6; Def. 56.1 Resp. ¶ 6.) In addition, Iacullo was the first person without an engineering degree to hold a non-administrative-management executive position at IDOT. (Pl. 56.1 St. ¶ 7.) After Iacullo took the position of Assistant to the District Engineer, three civil engineering positions within IDOT's Bureau of Maintenance were converted to technical

manager positions that did not require an engineering degree. (*Id.* ¶ 9.)  Two of the three positions were filled by former City of Chicago employees Michael Schivarelli and Anthony Dilacova. (*Id.* ¶ 9.)  While Iacullo knew of both individuals, he had no interaction with Dilacova during his tenure with the City of Chicago and only a few encounters with Schivarelli.  (*Id*; Iacullo Dep., pp. 48–56.)  Giovanni Fulgenzi, the Personnel Services Manager for District 1, became concerned that positions historically and traditionally held by civil engineers were being converted to positions held by non-engineers. (Pl. 56.1 St. ¶ 8.)

## III.     Anderson's Political Activity and Nonaffiliation

Anderson, who identifies himself as a Republican, testified that Iacullo had an inner circle of people who either had a "Chicago background," a "Democrat political background," or who would refrain from raising issues or challenging decisions made by Iacullo and his close associates. (Def. 56.1 St. ¶¶ 9, 14.)  Though Anderson expressed to Fulgenzi that he was concerned that the practices at IDOT were becoming more like those of the City of Chicago, he does not recall discussing with Iacullo his political views or lack of political affiliation with the "Chicago political faction."[2] (Def. 56.1 St. ¶¶ 9, 20–21; Pl. 56.1 St. ¶ 27.)  Iacullo was unaware of Anderson's voting record, donations, and volunteerism.  (Def. 56.1 St. ¶¶ 9, 20.)  According to Anderson, however, Iacullo was aware of his political affiliation and non-affiliation with the "Chicago political faction" because (1) Iacullo knew Anderson lived in West Dundee, Illinois— an area Anderson considers to be predominately republican; and (2) Anderson opposed being excluded in 2005 and 2007 from two employee interview panels in—one for a Communication

---

[2] Anderson refers in his Complaint to the "Chicago machine," "political machine," "Chicago political machine," and "Chicago Democratic Machine."  He testified that these mean the same thing. (Def. 56.1 St. ¶ 7.)

Center staff position and the other for Anderson's direct subordinate—based on his view that his exclusion violated the *Rutan* guidelines. (Def. 56.1 St. ¶¶ 32–34.)

Although Iacullo's inner circle may include both Republicans and Democrats, Anderson testified that "[w]hat was important was being in the inner circle, being affirmative to what Mr. Iacullo wanted to do, not offering any opposition or contradictory information, not questioning." (Def. 56.1 St. ¶ 11.) When asked what role political faction or lack of political affiliation to the Chicago Machine played in the 2007 District 1 reorganization, Anderson testified "[i]t is not a matter of affiliation with the Chicago machine. It is a matter of affiliation and loyalty to [Iacullo], to what he wanted." (*Id.* ¶ 12.) Anderson also testified that "it was more important to be loyal to Mr. Iacullo than a particular party named label. It was more important to be part of the inner circle, basically, to be a yes-man to go along." (*Id.* ¶ 10.) Iacullo has never been a candidate for a public office on behalf of a political party and the parties agree that Iacullo's "inner circle" is not a political party and is not the same thing as the "Chicago Democratic Machine." (*Id.* ¶ 15–16.) Neither Iacullo nor any members from his "inner circle" have ever asked Anderson to engage in political activities, make contributions to a candidate, or attend fundraisers or political events. (*Id.* ¶¶ 15–16.)

On August 24, 2007, Anderson directed an inquiry to Ellen Schanzle-Haskins, IDOT's Chief Legal Counsel, regarding an August 16, 2007 memorandum from the Governor's Chief of Staff, Clayton Harris, in which the Harris expressed the importance of not revealing confidential IDOT information to legislators. (*Id.* ¶ 23; Pl. 56.1 St. ¶ 31.) Upon receiving Harris's memo, Anderson emailed Schanzle-Haskins to confirm his understanding that "nothing in any Department communication is intended to limit our contact, as citizens and constituents without own elected officials." (Def. 56.1 St. ¶ 24; Pl. 56.1 St. ¶ 32.) Schanzle-Haskins responded, "You

are correct that directives are not aimed at your ability to communicate with your legislators in general, but not about IDOT information.  So long as you honor your duty to keep IDOT information confidential . . . you are good to go." (Def. 56.1 St. ¶ 24.)  Anderson's email did not reference his political affiliation with the Republican Party or lack of political affiliation with Iacullo or the Chicago political faction. (*Id.* ¶ 27.)  Schanzle-Haskins immediately forwarded her communication with Anderson to O'Keefe, Doubet, and Iacullo consistent with her common practice of keeping "top management" informed of the types of questions she received and how she had responded.  (*Id.* ¶ 25; Pl. 56.1 St. ¶ 33.)[3]  Within thirty minutes of receiving the email thread, Iacullo contacted Anderson by forwarding the same email back to him and stating, "See me Monday." (Def. 56.1 St. ¶ 33. )  Anderson met with Iacullo on Monday, August 27, 2007 at a Bureau Chiefs meeting. (Pl. 56.1 St. ¶ 34.)  Iacullo asked Anderson why he wanted to contact his legislators and whether  he wanted to contact his legislators about confidential IDOT information as prohibited by the Harris memo and IDOT's Personnel Manual. (*Id*; Def. 56.1 St. ¶ 26.)

Anderson also submitted an inquiry to the Illinois Attorney General's Office on December 12, 2008 regarding the implementation of the Supreme Court's decision in *Rutan*. (Def. 56.1 St. ¶ 31.)  He received a response to his inquiry on December 22, 2008. (*Id.*) Anderson describes his correspondence with his legislators and Attorney General's Office as

---

[3] Anderson disputes that Schanzle-Haskins's decision to forward the email to Iacullo and others was motivated by her common practice of keeping top management apprised of communications of this nature. However, Anderson fails to cite support in the record adequately rebutting Schanzle-Haskins's testimony.  An adequate rebuttal for example might be some document or testimony that revealed that this was not the regular practice at IDOT.  Anderson must "present more than mere speculation or conjecture" regarding Schanzle-Haskins's motives in order "to defeat a summary judgment motion." *See Nelms v. Modisett*, 153 F.3d 815, 819 (7th Cir. 1998) (quoting *Sybron v. Transition Corp. v. Security Ins. Co. of Hartford*, 107 F.3d 1250, 1254 (7th Cir. 1997)).  His dispute is further inadmissible under Federal Rule of Evidence 602, which prohibits speculation. *See* Fed.R.Evid. 602; *Payne v. Pauley*, 337 F.3d 767, 772 ("[A]lthough personal knowledge may include reasonable inferences, those inferences must be grounded in observation or other first-hand personal experience.  They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience.") (internal quotations omitted).  Here, Anderson is merely conjecturing what he believes is the state of mind of Schanzle-Haskins. Accordingly, the fact is deemed admitted.

"purely private communications" and there is no indication that Iacullo was familiar with the content of the communications or the fact that it took place. (*Id.* ¶¶ 30–31.)

## IV.     The IDOT Reorganization

Prior to 2008, IDOT's District 1 was composed of three bureaus: Electrical, Traffic, and Maintenance. (Def. 56.1 St. ¶ 39.) In 2004, Illinois Secretary of Transportation Tim Martin authorized a consultant study to look at reorganizing the Traffic and Electrical Bureaus, stating the reorganization was necessary due to "overlap" and "disconnect" between the bureaus. (Def. 56.1 St. ¶ 39; Pl. 56.1 St., Tab 5.) On March 8, 2005, Diane O'Keefe, the regional engineer, expressed in an email to Martin that the restructuring would "allow us to release [Anderson's] tight control of everything." (Pl. 56.1 St. ¶ 16.) The email goes on to state that "if [Anderson] continues to bottleneck, we may need to go further." (*Id.*) In an email dated March 29, 2005, O'Keefe suggested to Martin that Anderson be moved to "signals" as part of the overall reorganization. (*Id.* ¶ 19.) On July 14, 2006, HNTB, the consultant hired by IDOT, presented IDOT with the results of its study and assessments of IDOT operations and provided a number of recommendations, including the creation of a combined "Bureau of Traffic and Electrical Engineering." (Def. 56.1 St. ¶ 48.) According to HNTB, this structure would take "full advantage of existing ITS[4] knowledge base, and also [maintain a] single point of contact and authority for delivering ITS projects." (*Id.*) Accordingly, the HNTB report recommended consolidating and moving divisions into new or combined units. (*Id.*)

Iacullo supported reorganizing District 1 by reducing the number of bureaus from three to two. (*Id.* ¶41.) According to Iacullo, numerous issues at IDOT could not be resolved because the

---

[4] ITS, or "Intelligent Transportation Systems," is an "advanced technologies that measure traffic conditions and provide real-time information to motorists" used by IDOT "to improve transportation and mobility." (Def. 56.1 St. ¶ 40.)

8

Bureau of Traffic and Bureau of Electrical could not come to agreements on how to proceed or rectify matters dealing with ITS components on construction projects, major highways, and other projects and developments. (*Id.* ¶ 41.) Iacullo explained for example, that several years after construction was completed on Interstate Highway 57, the ITS components were not functioning properly and "the Bureaus of Traffic and Electrical, as well as construction and the contractor [were] pointing fingers at each other as to why the finalization of those components were not resolved." (*Id.* ¶ 42.) After attending a meeting where Martin "was explicitly dissatisfied with the fact that nobody was working out the problems to resolve the outstanding issues" on the Interstate 57 Project, Iacullo and others at IDOT determined that it would be beneficial to have all functions dealing with Traffic, Electrical, and ITS put under one supervisor to have one advocate or voice on how to resolve problems that have been developing as a result of the bureaus' constant disagreement on how to move forward. (*Id.* ¶¶ 42–43.)

Iacullo initiated monthly meetings with the Traffic and Electrical Bureaus and various "section heads" and bureau chiefs in order to facilitate discussions about the outstanding problems. (Def. 56.1 St. ¶ 44.) Iacullo, O'Keefe, Fulgenzi and others provided input into the reorganization of District 1 in December 2007. (*Id.* ¶ 50.) O'Keefe stated in an email dated December 18, 2007 that both the traffic and electrical bureaus needed "to be under one leader" and that she had presented an overview of the reorganization to Milt Sees, the Secretary of Transportation, and Chris Reed, Director of Highways, for approval. (*Id.* ¶ 52.) O'Keefe added that the reorganization "will greatly increase efficiency here in [District] 1." (*Id*; Pl. 56.1 St., Tab 5.) Anderson was not asked in 2007 to provide input into the reorganization of District 1 because the reorganization discussions took place at a level above him. (Def. 56.1 St. ¶ 51.)

9

Anderson was upset that the 2007 reorganization would eliminate his bureau and did not think the reorganization was in the best interest of IDOT. (*Id.* ¶ 38.) Specifically, Anderson did not think "[the reorganization] was a very good idea" and "opposed the manner in which [Iacullo] sought to reorganize [District 1] because it placed persons without technical expertise in decision-making positions." (Def. 56.1 St. ¶¶ 13, 37.) Anderson explained that his opposition to the 2007 reorganization consisted of "offering [his] professional opinion from having managed [the Bureau of Electrical Operations] for nearly 20 years" and maintains that he expressed to Iacullo his concerns regarding the separation of engineering and non-engineering functions as early as 2004. (*Id.* ¶ 13; Pl. 56.1 St. ¶ 18.)[5] Anderson characterizes his opposition as "a total professional disagreement with Mr. Iacullo about reorganization of operations." (Def. 56.1 St. ¶ 13.) According to Anderson, his opposition was "not a matter of affiliation with the Chicago machine" but rather "a matter of affiliation and loyalty to Iacullo, to what he wanted." (*Id.* ¶ 37.)

The reorganization went into effect on January 1, 2008. (Pl. 56.1 St. ¶ 19.) The letter announcing the reorganization stated:

> [T]he Bureaus of Traffic, Maintenance and Electrical Operations will be consolidated and reorganized. This change will bring needed organizational structure to the operations area.
>
> The new organization will consist of the Bureaus of Traffic Operations and Maintenance Operations headed by Steve Travia and James Stumpner, respectively. Major changes include movement of Traffic Sign Shops to the Bureau of Maintenance

---

[5] The Defendants, citing *Patterson v. Chicago Ass'n for Retarded Citizens*, 150 F.3d 724 (7th Cir. 1998), argue this statement of fact should not be considered by the Court because it is "based solely on Plaintiff's self-serving conclusory allegations that cannot create a genuine issue of material fact." The fact that evidence is self-serving, however, does not render it inadmissible. *Hill v. Tangherlini*, --- F.3d ----, 2013 WL 3942935, at *2 n.1 (7th Cir. Aug. 1, 2013) (overruling *Patterson* and other cases "to the extent they suggest a plaintiff may not rely on 'self-serving' evidence to create a material factual dispute"). Accordingly, Anderson's assertion based on his deposition testimony that he voiced concerns to Iacullo about the separation of engineering and non-engineering functions is properly before the court on summary judgment.

> Operations and the consolidation of major Traffic and Electrical
> Operations functions into the new Bureau of Traffic Operations.
>
> Please give Mr. Travia and Mr. Stumpner your full support during
> this reorganization period.

(Pl. 56.1 St., Tab 9.)  As a result of the reorganization, the Bureau of Electrical Operations of which Anderson was previously in charge became part of the Bureau of Traffic.  (Def. 56.1 St. ¶¶ 53–54.)  Anderson's new position under the reorganization was head of the Electrical Design Section. (Def. 56.1 St. ¶ 54.)  Although Anderson was able to maintain his pay grade and title as Technical Manager VII after the reorganization, he was now required to report to Steve Travia— the Bureau Chief of the reorganized Bureau of Traffic Operations. (*Id.*)

## V.  Anderson's Performance Evaluations

On January 8, 2008, Iacullo completed Anderson's performance evaluation for the period beginning October 1, 2006 and ending November 30, 2007. (Def. 56.1 St. ¶ 55.)  The evaluation stated that Anderson's "[p]erformance is acceptable and accomplishes objectives.  Results range from meets expectations to exceeds job requirements." (Def. 56.1, Tab 6, Ex. A.)  In the section titled "Supervisor's Comments," Iacullo stated that while Anderson had "proven himself as a very knowledgeable engineer," he "constantly presents an uncompromising attitude toward problem solving which causes confusion among the staff.  This is one of the underlying reasons we had reorganized the operations bureaus." (*Id.*)  In the section of the evaluation form calling for employee comments, Anderson expressed his disagreement with Iacullo's assessment and added that he felt the work environment was "hostile, isolating, and discriminatory …." (*Id.*)

On December 19, 2008, Anderson was issued a written reprimand for insubordination, disruptive conduct, and discourteous behavior. (Def. 56.1 St. ¶ 56.)  The discipline stemmed from Travia's instruction to Anderson to respond to an inquiry from the office of the Secretary of

Transportation. (*Id.*)  Anderson did not timely respond to the inquiry, which led Travia to follow up with him. (*Id.*)  Anderson responded, "I have no idea what this one is about.  I did not get any attachment other than the bucksheet, and don't understand how this is an electrical item. I did not get any paper on this." (*Id.*, Tab 4, Ex. A.)  Travia informed Anderson that his response was "disrespectful and insubordinate" and added that this was just the "latest of numerous instances where [Anderson] displayed the same type of lack of cooperation and professionalism towards [Travia] and … the Department." (*Id.*)  Travia concluded by stating that "[f]uture incidents of this nature may result in further discipline, up to and including discharge." (*Id.*)  The decision to issue Anderson a written reprimand was made after Travia brought numerous workplace issues to IDOT's personnel department. (*Id.* ¶ 57.)  The decision was also vetted with the IDOT District 1 administration and labor relations in Springfield. (*Id.*)  Iacullo and Scott W. Doubet, then-head of the Bureau of Personnel, were among the individuals copied on the letter. (*Id.*, Tab 4, Ex. A.)

On January 5, 2009, Travia completed Anderson's performance evaluation for the period December 1, 2007 through November 30, 2008. (*Id.* ¶ 58.)  Travia noted the resources that Anderson's "many years of Electrical Engineering" provided but stated that communication issues had developed between Anderson and his supervisor in recent months (*Id.*)  Travia recommended that Anderson "work on providing not only clear and concise answers but also unambiguous, informative and timely responses to inquiries." (*Id.*)  At a subsequent meeting to discuss the evaluation, Anderson refused to say anything regarding the negative performance review.  Travia offered to talk through the evaluation with Anderson at a later date but Anderson did not follow up with Travia and never asked how he could improve his performance. (Def. 56.1 St. ¶ 59.)  In addition to his own assessment of Anderson's performance, Travia received complaints about working with Anderson from the following individuals: Pete Harmon, Bureau

12

Chief of Programming; Gene Joynt, Bureau Chief of Construction; Kathy Kribble, Section Chief in the Bureau of Design; John Bazek, Section Chief in the Bureau of Programming; and John Fortmann, Engineer of Program Development. (*Id.* ¶ 60.)

## VI.   Anderson's Suspension, Termination, and Subsequent Lawsuit

On May 11, 2009, Anderson was suspended for five days without pay for insubordination and failure to follow procedures. (*Id.* ¶ 64.)  The stated reason for Anderson's suspension was a refusal to follow his supervisor's direction regarding IDOT's new timekeeping procedure, failure to obtain pre-approval from his supervisor when taking time off, and unexcused absence from various meetings his supervisors told him to attend. (*Id.*)  Anderson's suspension followed the same discipline procedure as his written reprimand – the suspension was recommended by Travia to IDOT's personnel department in District 1 and vetted through the labors relations department in Springfield, Illinois. (*Id.* ¶ 65.)

On December 7, 2009, Anderson was notified that he was being terminated for insubordination, failure to follow procedures, unprofessional conduct, and disruptive conduct. (*Id.* ¶ 66.)  The termination letter stated the decision to terminate was made "as a result of the pre-disciplinary meeting held Friday, on October 30, 2009, and after careful review and consideration of the statement of charges and supporting documentation presented to Anderson and Anderson's response and rebuttal to the charges dated November 5, 2009." (*Id.* ¶ 68.)  The specific charges against Anderson are set forth in a document entitled, "Addendum to Statement of Charges," dated October 30, 2009. (*Id.*, Ex. B.)  The Addendum cites and provides documentary support for 17 separate incidents of alleged insubordination, failure to follow procedures, unprofessional conduct, or disruptive conduct between May 25, 2009 and October 23, 2009. (*Id.* ¶ 67, Ex. B: Tabs A–Q.)

13

The Addendum also contained two "Investigative Reports" based on interviews with John Fortmann, Engineer of Program Development, and Eugene Joynt, Bureau Chief of Construction. (*Id.* ¶ 68–69.) Fortmann indicated that he had received a "number of complaints … [demonstrating Anderson's] reluctance to provide clear and concise answers to a specific question where his professional advice was needed" and his tendency to "engage in unnecessary, long-winded replies that would invariably relate to his personal views as to what the Department's position on that particular project should be." (*Id.* ¶ 68.) Fortmann also noted that projects were often delayed or rushed due to Anderson's tendency to rediscuss issues that had been previously been rejected. (*Id.*) Joynt stated that in his experience, Anderson has "missed no opportunity to criticize the progress or supervision of a project without offering solutions." (*Id.* ¶ 69.)

Anderson's discharge followed the same discipline procedures as his written reprimand and five-day suspension: Iacullo and other members of senior management in District 1, including O'Keefe, recommended Anderson's termination to IDOT's central office of Personnel and Labor Relations. (*Id.* ¶ 70.) Iacullo agreed with the decision to terminate Anderson and stated that he had been frustrated with Anderson for years, dating back to the 2007 reorganization. (*Id.* ¶ 71.) Fulgenzi also agreed with the decision to terminate Anderson and testified that he had problems with Anderson on at least one or more occasions. (*Id.* ¶ 72.) Specifically, Fulgenzi stated that he felt Anderson was "holding the line a bit too hard on … some policy issues." (*Id.*) Fulgenzi also stated that Anderson was "hard to deal with." (*Id.*) Anderson submitted a rebuttal addressing each of the 17 charges supporting his termination. (Pl. 56.1 St. ¶ 35.)

On November 1, 2010, Anderson filed a two-count First Amended Complaint alleging that Iacullo and Travia[6] caused IDOT to terminate him because of his political affiliation in violation of the First Amendment. (Def. 56.1 St. ¶ 5.)  Count II of Anderson's First Amended Complaint petitions for writ of certiorari pursuant to Illinois state law, seeking review of IDOT's decision to terminate him. (*Id.*)

## DISCUSSION

## I.      Count I – First Amendment Retaliation

"The First Amendment protects a person from being removed from public employment for purely political reasons, with certain exceptions for policymaking positions and employees having a confidential relationship with a superior." *Zerante v. DeLuca*, 555 F.3d 582, 584–585 (7th Cir. 2009) (citing *Pleva v. Norquist*, 195 F.3d 905, 911 (7th Cir. 1999)); *see also Carlson v. Gorecki*, 374 F.3d 461, 464 (7th Cir. 2004) (with limited exceptions, public employees may not be made to suffer adverse employment actions because of their political beliefs); *Nelms*, 153 F.3d at 818 (dismissals of public employees for reasons of political patronage are violations of the First Amendment unless party affiliation is an appropriate requirement for the position involved).

At the outset, the Court notes that both parties misstate the applicable framework in cases alleging a violation of First Amendment rights.  Relying on *Gunville v. Walker*, 583 F.3d 979, 984 n.1 (7th Cir. 2009), the parties assert in their briefs that in order to make a *prima facie* case for political discrimination based on the First Amendment, Anderson must show, among other things, that his protected activity was the "but-for" cause of his termination.  This is incorrect;

---

[6] Anderson has since dismissed his claims against Travia, with prejudice. (Dkts. 104–106.)

Anderson need only show that his speech was a "motivating factor," not a "but-for cause," of an adverse employment action. *Green v. Doruff*, 660 F.3d 975, 977 (7th Cir. 2011); *see also Kidwell v. Eisenhauer*, 679 F.3d 957, at 964–65 (7th Cir. 2012) (discussing *Greene*); *Foster v. Adams*, 489 Fed.Appx. 959, 961 (7th Cir. 2012). The parties' misunderstanding arises from the fact that neither Anderson nor the Defendants appear to have recognized that the law in the Circuit governing the plaintiff's initial burden in First Amendment retaliation cases changed approximately one year before briefing on Defendants' Motion for Summary Judgment commenced. Due to the relatively recent development in the law and because this Court's previous rulings in First Amendment retaliation cases applied the old rule (as set forth in *Gunville*), the Court takes this opportunity to review the law governing the causation requirement in these types of cases.

It was previously the well-established law of this Circuit that plaintiff seeking to bring a "claim for retaliation in violation of First Amendment rights in the public employment context" must show, among other things, that his speech was "a substantial or motivating factor in the [employer's] retaliatory action." *Spiegla v. Hull*, 371 F.3d 928 (7th Cir. 2004); *see also Hall v. Babb*, 389 F.3d 758, 762 (7th Cir. 2004); *Sullivan v. Ramirez*, 360 F.3d 692, 697 (7th Cir. 2004); *Simmons v. Chicago Bd. of Educ.*, 289 F.3d 488, 495 (7th Cir. 2002); *Vakudinovich v. Board of Sch. Trustees of North Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002); *Kuchenreuther v. City of Milwaukee*, 221 F.3d 967, 973 (7th Cir. 2000); *Kokkinis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir. 1999); *Nelms*, 153 F.3d at 818. The apparent confusion surrounding the causation requirement in First Amendment retaliation cases stems from the Supreme Court's decision in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009). In *Gross*, the Court addressed the issue of "whether the burden of persuasion ever shifts to the party defending an alleged mixed-

motives discrimination claim brought under the ADEA." *Id.* at 173. The petitioner in that case relied on the statutory text and legal precedent governing Title VII, which "authorize[e] discrimination claims in which an improper consideration was a 'motivating factor' for an adverse employment action." *Id.* at 174 (citing 42 U.S.C. § 200e–2(m), and *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 94–95 (2003)). In rejecting the petitioner's argument, the Court held that the ADEA is not governed by its previous Title VII decisions in this regard, reasoning that "[u]nlike Title VII, the ADEA's text does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor." *Id.* at 174. The Court found that because the text of the ADEA makes it "unlawful for an employer to [engage in discriminatory employment practices] *because of* such individual's age …. a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision" in order to establish a disparate treatment claim. *Id.* at 176. (citations omitted).

In *Fairley v. Andrews*, 578 F.3d 518 (7th Cir. 2009), the Seventh Circuit interpreted *Gross* to stand for the broader proposition that "unless a statute … provides otherwise, demonstrating but-for causation is part of the plaintiff's burden in all suits under federal law," including First Amendment retaliation claims. *Id.* at 525–26. The *Fairley* court did not mention, much less discuss or distinguish the Seventh Circuit's previous holdings in *Spiegla*, *Hall*, *Sullivan*, *Simmons*, *Vakudinovich*, *Kuchenreuther*, *Kokkinis*, and *Nelms*. Subsequent Seventh Circuit decisions, *Gunville* among them, reinforced the but-for causation requirement in First Amendment claims set forth in *Fairley*. *See, e.g., Kodish v. Oakbrook Terrace Fire Protection Dist.*, 604 F.3d 490, 501 (7th Cir. 2010) ("Our older cases omitted the but-for causation requirement … but the Supreme Court has recently clarified [in *Gross*] that unless a federal statute provides otherwise, the plaintiff bears the burden of demonstrating but-for causation in

17

suits brought under federal law.") (internal citations omitted); *Gunville*, 583 F.3d at 984 n.1 ("Until the Supreme Court's recent decision in [*Gross*], plaintiffs could prevail in a First Amendment §1983 action if they could demonstrate that their speech was a motivating factor in the defendant's decision. After *Gross*, plaintiffs in federal suits must demonstrate but-for causation unless a statute … provides otherwise."). Indeed this very Court, citing *Gunville*, held on two occasions that a plaintiff seeking to make a *prima facie* case for First Amendment retaliation must establish that the protected conduct was a but-for cause of the adverse employment action. *See Everett v. Cook County*, 704 F.Supp.2d 794, 806 (N.D. Ill. 2010); *Fagbemi v. City of Chicago*, No. 08 C 3736, 2010 WL 1193809, at *6 (N.D. Ill. Mar. 19, 2010).

However, in *Greene*, 660 F.3d 975, the Seventh Circuit found the *Fairley* line of cases in "tension" with its previous decision in *Spiegla*. *Id.* at 977. The court noted that the standard set forth in *Spiegla* "was not a Seventh Circuit innovation" but "followed directly from the Supreme Court's decision in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977), also a First Amendment case and not overruled by *Gross* …." *Id.* at 977. Recognizing that "district courts of this circuit have been puzzled by what they believe to be an unresolved conflict between *Fairley* and *Spiegla*," the court found that although *Gross* may have implications for suits brought under statutes other than the ADEA, "it does not affect suits to enforce First Amendment rights …. The *Mt. Healthy* standard continues to govern such suits, and will do so until the Supreme Court alters the standard." *Id.* (citations omitted).

Decisions following *Greene* have consistently held that a plaintiff seeking to make a *prima facie* case for First Amendment retaliation may satisfy the causation requirement by showing that his protected activity was a "motivating factor" in the defendant's decision to take adverse action. *See Peele v. Burch*, --- F.3d ----, 2013 WL 3455705, at *2 (7th Cir. July 9, 2013);

18

*Mays v. Springborn*, --- F.3d ----, 2013 WL 2504964, at *2 (7th Cir. June 11, 2013) (rejecting state's argument it is not enough for the plaintiff to prove that his protected activity was a "motivating factor" in the defendants' decision to retaliate against him and that the plaintiff had the further burden of showing that the allegedly retaliatory action would not have happened but for his activity, holding that the such a rule is "inapplicable to First Amendment cases."); *see also Kidwell*, 679 F.3d at 964–65; *Redd v. Nolan*, 663 F.3d 287, 294 (7th Cir. 2011); *Foster*, 489 Fed.Appx. at 961.

Accordingly, in order to make out a *prima facie* case for First Amendment retaliation, Anderson must show that: (1) he engaged in activity protected by the First Amendment; (2) he suffered an adverse action that would likely deter free speech; and (3) the First Amendment activity was a motivating factor in Iacullo's decision to take adverse action against him. *See Redd*, 663 F.3d at 294 (citing *Greene v. Doruff*, 660 F.3d 975, 977–78 (7th Cir. 2011)); *see also Mays*, 2013 WL 2504964, at *2. If Anderson is able to furnish a *prima facie* case, the burden shifts to Iacullo to show that the retaliatory motive was not a "but for" cause, or a "necessary condition of the harm—the harm would have occurred anyway." *Greene*, 660 F.3d at 980.  In this case, Iacullo concedes that termination due to political affiliation or lack of political affiliation is a deprivation likely to deter constitutionally protected conduct.  Therefore the second element is not at issue.  In addition, Iacullo does not dispute and thus concedes that he was a decisionmaker in the decision to discharge Anderson.

### A.    Anderson's Nonaffiliation with Iacullo and his "Inner Circle"

In order to meet the first requirement of his *prima facie* case, a plaintiff must establish that he engaged in activity protected by the First Amendment. *See Redd*, 663 F.3d at 294.  Just as affiliation with a particular political party is constitutionally protected under the First

Amendment, *see Gunville*, 583 F.3d at 984, "[i]t is undisputed that political nonaffiliation is a right protected under the first amendment." *Hermes v. Hein*, 742 F.2d 350, 353 n.3 (7th Cir. 1984) (citing *Elrod v. Burns*, 427 U.S. 347 (1976), and *Branti v. Finkel*, 445 U.S. 507 (1980)). However, "not every association of a public employee can support a Section 1983 claim." *Wrobel v. County of Erie*, 692 F.3d 22, 28 (2d Cir. 2012). It is well established that "a public employee is protected from adverse employment consequences based on the exercise of the right to freedom of association only when the associational conduct relates to a matter of public concern." *Klug v. Chicago Sch. Reform Bd. of Trustees*, 197 F.3d 853, 857 (7th Cir. 1999) (citing *Balton v. City of Milwaukee*, 133 F.3d 1036 (7th Cir. 1999), *Balton v. City of Milwaukee*, 133 F.3d 1036 (7th Cir. 1998), *Marshall v. Allen*, 984 F.2d 787 (7th Cir. 1993), and *Griffin v. Thomas*, 929 F.2d 1210 (7th Cir. 1991)). In other words, the employee's "association, or refusal to associate, must be political in nature or implicate some other constitutional concerns." *Barry v. Moran*, 661 F.3d 696, 704 (1st Cir. 2011) ("[T]he First Amendment invests public employees with certain rights, it does not empower them to constitutionalize the employee grievance.") (citing *Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006)). Accordingly, "mere personal association without political overtones does not implicate First Amendment concerns, and 'the burden of proof [is] on the plaintiff to demonstrate that her association was political and not personal.' " *Barry*, 661 F.3d at 704 (quoting *Padilla-Garcia v. Guillermo Rodriguez*, 212 F.3d 69, 76 (1st Cir. 2000)).

Anderson's refusal to affiliate with Iacullo and what Anderson describes as Iacullo's "inner circle" does not relate to a matter of public concern and therefore does not constitute protected activity under the First Amendment. Anderson does not dispute that Iacullo has never been a candidate for political office on behalf of any political party, nor does he point to

evidence suggesting that any member of Iacullo's "inner circle" have been candidates for public office.   Although Anderson insists Iacullo is closely connected to and aligned with the "Chicago Democratic political machine," he admits that Iacullo's "inner circle" is not a political party and is not the same thing as the "Chicago Democratic Machine."   Indeed Anderson concedes that "it was more important to be loyal to Mr. Iacullo than a particular party named label.  It was more important to be part of the inner circle, basically, to be a yes-man to go along" with what Iacullo wanted.  Furthermore, it is clear from the record that Anderson's refusal to affiliate with Iacullo stemmed not from Iacullo's political party or political faction affiliation but rather from the two individuals' divergent views regarding the reorganization of IDOT and the hiring of non-engineers.   In other words, Anderson's nonaffiliation with Iacullo and what Anderson's perceived as Iacullo's "inner circle" was driven more by "office politics than … matters of public concern." *Klug*, 197 F.3d at 858; *see also Barry*, 661 F.3d at 705 ("While appellants consistently use the label 'political' to the decision-making process that resulted in the challenged adverse employment actions, they use this adjective to refer to office politics and interpersonal relationships rather than the conduct of government, public policy, or public controversy.").  Mere favoritism and institutional politics are not sufficiently political. *See Barry*, 661 F.3d at 706 (employment decision based on "back-scratching, log-rolling, horse-trading, institutional politics, envy, nepotism, [and] spite" are unsavory but "not illegal motivations for employment decisions") (quoting *Stratton v. Dep't for the Aging for City of New York*, 132 F.3d 869, 880 (2d Cir. 1997)); *Neal v. Roche*, 349 F.3d 1246, 1252 (10th Cir. 2003) ("The friendship and nepotism cases only illustrate a broader principle: that employers are free to employ nondiscriminatory criteria that are 'unfair' or even reprehensible, so long as they are not discriminatory.").  Thus, even accepting as true Anderson's claim that he was cast out because

21

he, unlike other IDOT employees, refused to curry favor with Iacullo by "not questioning him" and "going along with what [Iacullo] wanted," Anderson cannot meet the first requirement of his *prima facie* case based on his nonaffiliation to Iacullo. Accordingly, Anderson's First Amendment retaliation claim based on his alleged refusal to affiliate with Iacullo fails as a matter of law.

Furthermore, even if refusing to be a part of Iacullo's "inner circle" was protected under the First Amendment, Anderson cannot survive summary judgment with respect to Count I because he has not shown that his political affiliation was a "motivating factor" in Iacullo's decision to seek his termination. *Redd*, 663 F.3d at 294. A "motivating factor" is one that is a "sufficient condition" for an adverse action. *Greene*, 660 F.3d at 978–979. In other words, the presence of the factor guaranteed the adverse action. *Id.* Anderson's burden in this regard is "not insignificant," *Nelms*, 153 F.3d at 818 (quoting *Nekolny v. Painter*, 653 F.2d 1164, 1168 (7th Cir. 1981)), and [i]t is not enough to show only that the plaintiff was of a different political persuasion than the decisionmakers." *Hall*, 389 F.3d at 762; *see also Nekolny*, 653 F.2d at 1168 ("A disgruntled employee fired for legitimate reasons would not be able to satisfy his burden merely by showing that he carried the political card of the opposition party or that he favored the defendant's opponents in the election.").

The record in this case is devoid of facts connecting Anderson's nonaffiliation with Iacullo to his termination. Anderson attempts forge a causal link by (1) attacking the legitimacy of Defendants' stated reasons for terminating his employment; and (2) naming other current and former IDOT employees who he contends were hired or transferred on the basis of political patronage. Anderson's first theory of causation puts the cart before the horse because it prematurely shifts the burden of proof to Iacullo before he has established a *prima facie* case.

Iacullo has no burden and does not need to show that there were legitimate non-political reasons for his decision until Anderson first shows that his political nonaffiliation was a motivating factor in Iacullo's decision seek his termination. *See, e.g., Peele*, 2013 WL 3455705, at *3 ("[Plaintiff] must *first* provide evidence that the defendants were motivated, at least in part, by a desire to retaliate against him for his protected speech. If he does, *then* the defendants may counter by showing that they would have reached the same result even without the protected speech.") (emphasis added).

Courts have found that "a past pattern of political patronage may sometimes support a finding of political motivation." *See Hall*, 389 F.3d at 764 (citing *Felton*, 5 F.3d at 202–204). In this case, Anderson points to the following four personnel decisions as evidence of political patronage at IDOT following Iacullo's arrival in 2004: the hire of (1) Michael Schivarelli and (2) Anthony Dilacova, former City of Chicago employees who do not have engineering credentials but were nevertheless assigned to positions that previously required such credentials; (3) the hire of Robert Duda, a former City of Chicago employee who was offered a position as yard technician for IDOT; and (4) the transfer of former Chicago Alderman Rafael Frias to a yard technician position that allowed him to work close to his home. However Anderson fails to cite any facts linking Iacullo or anyone in what Anderson characterizes as Iacullo's "inner circle" to IDOT's personnel decisions with respect to these four individuals. The record contains no indication that Iacullo had any interaction with Schivarelli or Dilacova other than seeing them at department meetings during his employment with the City of Chicago. There is also no evidence in the record contradicting Iacullo's testimony that he did not know Frias outside of being familiar with him in his official capacity as a Chicago Alderman and did not personally interact with Duda outside of Duda's role in the Department of Aviation. Furthermore, Anderson has

23

failed to offer anything other than his own conjecture to suggest that Iacullo recommended, interviewed, or otherwise influenced IDOT's decision to transfer Frias or hire Schivarelli, Dilacova, and Duda. Aside from the fact that all four individuals either worked for the City of Chicago or served the city in an elected capacity before coming to IDOT, the record is entirely devoid of evidence from which a jury could infer political patronage on Iacullo's part. Accordingly, Anderson failed to establish Iacullo engaged in a pattern of political patronage hiring after arriving at IDOT in 2004. Even the Court were to infer such a pattern, Anderson does not point to any facts in the record raising the inference that such past patronage contributed to his discharge.

### B. Anderson's Political Affiliation as a Republican

Anderson argues in his response brief that he does not allege being targeted by Iacullo because he is a Republican. (Pl. Resp., p. 2.) However, in his Response to Defendants' Rule 56.1(A)(3) Statement, Anderson somewhat equivocates, asserting that he "does not allege that his status as a Republican is the *sole* reason he was discriminated against for political reasons" and adding that his political affiliation was "one of the factors relevant to his exclusion from and discrimination by the Chicago political faction at IDOT ...." (Pl. 56.1 Resp. ¶ 9.) To the extent Anderson's political affiliation as a Republican is a component of his theory of liability against Iacullo, Anderson has not made the *prima facie* showing necessary to defeat summary judgment. Although Anderson's affiliation as a Republican is undeniably political in nature and protected under the First Amendment, *see Gunville*, 583 F.3d at 984 ("The plaintiffs' affiliation with the Republican party is protected under the First Amendment ....") (citing *Rutan*, 497 U.S. at 64), he fails to establish the third requirement of his *prima facie* case – that his political party affiliation was a motivating factor in the Defendants' decision to terminate his employment.

24

"In analyzing this issue, the threshold question is whether the defendants even knew about the political activities" of Anderson. *Hall*, 389 F.3d 762; *see also Delapaz v. Richardson*, 634 F.3d 895, 900 (7th Cir. 2011) ("[T]o demonstrate causation in this context, plaintiffs must show that the defendant knew of their party affiliation."). A decisionmaker cannot retaliate on account of the protected activity if he is unaware of the protected activity. *See Healy v. City of Chi.*, 450 F.3d 732, 740–41 (7th Cir. 2006) (citing *Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004)) ("It is not sufficient that [the defendant] *could* or even *should* have known about [the plaintiff's] complaints; she must have had actual knowledge of the complaints for her decisions to be retaliatory.") (emphasis in original), and *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000) ("[A]n employer cannot retaliate when it is unaware of any complaints."). Anderson offers no evidence that any decisionmaker at IDOT was aware of his political persuasion. Indeed Iacullo affirmatively denied any knowledge of Anderson's political views. Iacullo's denial is corroborated by Anderson himself, who admits that he has no recollection of ever discussing with Iacullo his political affiliation as a Republican or nonaffiliation with the Chicago democratic political machine. *See, e.g., Everett*, 704 F.Supp.2d at 805 (plaintiff failed to demonstrate a factual dispute where defendant denied at her deposition that she was aware of plaintiff's political affiliations and plaintiff failed to produce "any evidence directly rebutting this testimony or showing that any Cook County employee knew of her political affiliation").

Anderson suggests that Iacullo knew he was a Republican because (1) Iacullo was aware Anderson lived in West Dundee, Illinois—an area Anderson considers to be known as predominately Republican; (2) Iacullo was aware of communication between Anderson and elected officials as well as an email Anderson sent to Schanzle-Haskins regarding the propriety

of such communication; and (3) Anderson opposed being excluded from two employee interview panels in 2005 and 2007—one for a Communication Center staff position and the other for Anderson's direct subordinate—based on his view that his exclusion violated the *Rutan* guidelines. Anderson's first contention is speculative and utterly lacking foundation. The mere suggestion that Iacullo may have been aware that Anderson lived in a heavily-republican neighborhood, even if admissible, is insufficient to establish Iacullo knowledge of Anderson's political persuasion. *See Nelms*, 153 F.3d at 819 ("A party must present more than mere speculation or conjecture to defeat a summary judgment motion.") (quoting *Sybron*, 107 F.3d at 1254).

Nor can Anderson convincingly maintain that Iacullo was aware of his political party affiliation based on his 2007 email to Schanzle-Haskins, his various correspondences with state legislators and the Office of the Illinois Attorney General,[7] or his objections to his exclusion from two employee interview panels. Anderson's email to Schanzle-Haskins, which was forwarded to Iacullo, does not reference Anderson's political affiliation, lack of political affiliation or, his refusal to associate with Iacullo and his "inner circle." Instead, the email merely confirmed Anderson's understanding that the memo recently distributed by IDOT's Chief of Staff was not intended to limit IDOT employees' contact as citizens and constituents with their elected officials. As for Anderson's communications with legislators and the Office of the Illinois Attorney General, Anderson fails to point to any evidence indicating that Iacullo ever saw these documents or knew what they contained. Indeed Anderson admits that his communications with legislators were "purely private communications." Finally, Anderson's

---

[7] Anderson discusses his communications with legislators and the Office of the Illinois Attorney General in his Local Rule 56.1 statements but does not mention them in his brief in opposition brief.

opposition to being excluded from the employee interview and selection process for two positions does not appear to have revealed anything about Anderson's political persuasion. Accordingly, Anderson has failed to present evidence from which a trier of fact could reasonably infer that Iacullo knew his political affiliation. *See Kelly v. Mun. Ct. of Marion County, Ind.*, 97 F.3d 902, 912 (7th Cir. 1996) (without evidence that a supervisor was aware of the plaintiff's decision to withdraw from politics, plaintiff failed to demonstrate that his political views were a motivating or substantial factor in his termination); *see also Hall*, 389 F.3d at 763 ("Hall's failure to offer evidence that would have shown that at least two of the three hiring committee members knew about the political background of the two applicants, or that the hiring decision was manipulated by one member who possessed such knowledge, dooms his case.").

Even if the Court were to assume Iacullo divined Anderson's political affiliation or lack thereof from his 2007 email to Schanzle-Haskins and his objection being excluded from interview panels in 2004 and 2007, the record does not support the inference that Anderson's affiliation as a Republican motivated Iacullo's decision to support the termination of his employment. Anderson points to no statement, act, or other conduct by Iacullo or any other decisionmaker that suggests he was fired for being a Republican. *See, e.g., Nekolny*, 653 F.2d at 1168–69 (plaintiffs met their initial burden of demonstrating that their termination was politically motivated where the defendant's assistant specifically had informed them that they were losing their jobs because they had worked against the defendant in the election). And, notwithstanding his assertions to the contrary, Anderson has not put forth evidence revealing that it was Iacullo's practice to rely on political affiliation in making employment decisions. *Felton v. Bd. of Comm'rs of Greene County*, 5 F.3d 198 (7th Cir. 1993) (finding that defendant unlawfully

27

considered politically affiliation where evidence revealed that the decisionmakers engaged in a longstanding practice of relying on political affiliation in staffing the position at issue).

### C. Anderson's Alleged Protected Speech

Anderson also cannot maintain a First Amendment claim against Iacullo under the theory that he was terminated for engaging in protected speech. Anderson's First Amended Complaint contains no allegations that could reasonably have put the Defendants on notice that his claims were based on protected speech. However, Anderson now argues for the first time in his response brief that he was terminated not only for refusing to affiliate with Iacullo's faction but because of various statements he made after Iacullo arrived at IDOT in 2004. Specifically, Anderson argues in his response brief that he was targeted for (1) opposing the reorganization of District 1; (2) opposing the placement of individuals without engineering backgrounds in decision-making positions; and (3) asking Schanzle-Haskins about the propriety of communicating with his elected officials in light of a memo recently-circulated by the Governor's Chief of Staff. (Pl. Resp., p. 13–14.)

It is well established in this Circuit that a plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *E.E.O.C. v. Lee's Log Cabin, Inc.*, 546 F.3d 438, 443 (7th Cir. 2008) (quoting *Grayson v. O'Neill*, 308 F.3d 808 (7th Cir. 2002)); *see also Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996). Anderson's Complaint alleges that he was terminated in violation of his First Amendment rights based on his refusal to affiliate with or show politically loyalty to the "Chicago patronage machine faction" and for "not supporting Iacullo's ongoing attempts to assert political control over IDOT's functions." (Amend. Complaint, ¶¶ 32–33, 41, 50.) Although the Complaint mentions the reorganization and the hiring of non-engineers, it does not allege or even suggest that the basis

for Anderson's claim is that he engaged in protected speech. Indeed the Complaint does not contain a single allegation that Anderson engaged in any affirmative conduct such as making statements against the reorganization or contacting elected officials. "Federal Rule of Civil Procedure 8(a) requires that a complaint adequately plead facts to put a defendant on notice of the plaintiff's claim[.]" *Segal v. Geisha NYC LLC*, 517 F.3d 501, 505 (7th Cir. 2008). Because the Complaint does not allege a claim based on protected speech, any theory of liability derived therefrom is deemed waived.

Even if the Court were to permit Anderson to amend his Complaint at this late stage in the proceedings to assert a claim based on protected speech, such amendment would be futile. First, most of the alleged speech Anderson argues formed the basis of the Defendants' decision to terminate his employment is not protected under the First Amendment. Second, Anderson has failed to present any evidence demonstrating that there may be a causal link between the speech and his termination. Determining whether speech is constitutionally protected "is a question of law for the court." *Houskins v. Sheahan*, 549 F.3d 480, 489 (7th Cir. 2008). "The First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Morales v. Jones*, 494 F.3d 590, 595 (7th Cir. 2007); *see also Houskins*, 549 F.3d at 490 (if an "employee spoke as a citizen on a matter of public concern," then "her interest as a citizen in commenting on the matter of public concern outweigh[s] the State's interest in promoting effective and efficient public service"). However, the Supreme Court has found that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. This is because "when employees speak pursuant to their official duties they are not

speaking *as citizens*, regardless of whether the speech is about a matter of public concern."
*Bivens v. Trent*, 591 F.3d 555, 560 (7th Cir. 2010) (citing *Garcetti*, 547 U.S. at 421) (emphasis in
original). Accordingly, the framework set forth in *Garcetti* requires that the Court "first decide
whether [Anderson] was speaking 'as a citizen' or as part of [his] public job, before asking
whether the subject-matter of particular speech is a topic of public concern." *See Houskins*, 549
F.3d at 490. Then, if the Court finds that Anderson spoke on a matter of public concern, the
Court must apply "the *Pickering* balancing test, balancing the employee's interest in commenting
upon such matters and the employer's interest in efficient public service." *Cygan v. Wisc. Dept.
of Corrs.*, 388 F.3d 1092, 1099 (7th Cir. 2002) (citing *Pickering v. Bd. of Educ. of Twp. High
Sch. Dist.*, 391 U.S. 563, 568 (1968)).

### 1. Anderson's Opposition to the District 1 Reorganization and the Placement of Engineers in Non-Technical Positions

It is clear from the record that to the extent Anderson expressed opposition to the District
1 reorganization and placement of non-engineers, he did so not as a private citizen but as the
Bureau Chief of the Bureau of Electrical Operations. Anderson admits that in addition to being
upset that the 2007 reorganization would eliminate his bureau, he opposed the reorganization
based on a "professional disagreement" with Iacullo over whether the reorganization was in the
best interest of IDOT. Anderson characterizes his view as a "professional opinion from having
managed that group for nearly 20 years." In light of these admissions, Anderson's attempts to
now frame his professional disagreements with Iacullo and other members of IDOT's upper
management as opposition to the "politicization" or "political factionalization" of District 1 are
unconvincing. Indeed when asked what role political faction or lack of political affiliation to the
Chicago Machine played in the 2007 District 1 reorganization, Anderson made clear that "[i]t is

not a matter of affiliation with the Chicago machine. It is a matter of affiliation and loyalty to [Iacullo], to what he wanted." Therefore, Anderson's opposition to the IDOT reorganization and the hiring of non-engineers as a member of IDOT upper management does not constitute speech protected under the First Amendment. *See, e.g., Mills v. City of Evansville, Ind.*, 452 F.3d 646, 648 (7th Cir. 2006) (police sergeant's vocal criticisms about her boss's personnel decision were made in her capacity as a public employee contributing to the formation and execution of official policy).

Even assuming the expression of his professional disagreement with Iacullo and other members of upper management was protected under the First Amendment (and Anderson's claim based on that speech was not waived), Anderson cannot withstand summary judgment because he has failed to show that his opposition was a motivating factor in Iacullo's decision to seek his termination. Anderson repeatedly asserts that a 2005 email, in which O'Keefe states to Martin that the IDOT reorganization allow IDOT to "release [Anderson's] tight control" over electrical operations, shows that he was targeted as early as 2005. However this email is not the smoking gun Anderson purports it to be. Neither the email nor any other communications between O'Keefe and others refer to Anderson's political affiliation as a Republican or his non-affiliation with Iacullo or the Chicago democratic political machine. Nor do they mention any of the alleged protected speech Anderson argues motivated the Defendants' decision to terminate his employment. At best, the communication shows that O'Keefe and others did not like Anderson and saw it as an added benefit to the reorganization that he would no longer be assigned to a Bureau Chief position. However, being a victim of office politics, though arguably unfair, does not give rise to a constitutional claim under the First Amendment. *See Barry*, 661 F.3d at 706; *Neal*, 349 F.3d at 1252.

Moreover, Anderson does not allege that O'Keefe was a decisionmaker with respect to his termination or argue, under a "cat's paw" theory of liability, that she materially influenced Iacullo's decision to seek Anderson's termination. Statements are probative of retaliatory intent only if they are "both made by the decisionmaker and related to the employment decision at issue." *Fyfe v. City of Fort Wayne*, 241 F.3d 597, 602 (7th Cir. 2001) (citing *Stopka v. Alliance of Am. Insurers*, 141 F.3d 681, 688 (7th Cir. 1998)). In *Nelms*, 153 F.3d 815, for example, the plaintiff, a field investigator with the Indiana Attorney General's Office who had previously run for office as a Republican, alleged that he was terminated based on, among other things, his political affiliation as a Republican in violation of the First Amendment. *Id.* at 816–817. The Plaintiff relied on comments made by (1) a fellow field investigator who told him "you are going out of here … you're a Republican politician, and my people are in there"; (2) his supervisor's comment that she was aware the plaintiff ran for office as a Republican and that his political affiliation may be a problem for the Attorney General and his Chief of Staff; and (3) the Attorney General's Chief of Staff, who told the plaintiff "you understand political realities," when he discharged him. *Id.* at 819.

Notwithstanding the directness of these comments—especially when compared to the communication cited by Anderson here—the court found that neither the supervisor nor the fellow field investigator's comments created a disputed issue of material fact because neither individual was involved in the decision to terminate the plaintiff. *Id.* The court also held that the "innocuous" comment made by the Attorney General's Chief of Staff failed to demonstrate that the plaintiff was terminated due to his political affiliation when taken together with other evidence that the entire department was restructuring and downsizing the role of field investigators and because another field investigator had "seniority and more exemplary work

habits." *Id.* at 820. Similarly, O'Keefe's statement suggesting that Anderson's control over electrical operations was an undesirable arrangement is neither here nor there with respect to Iacullo's decision to seek Anderson's termination.

### 2. Anderson's 2007 Email to Schanzle-Haskins

Unlike his opposition to the District 1 reorganization and the hiring of non-engineers, Anderson's email to Schanzle-Haskins regarding whether he could contact his elected officials is protected under the First Amendment. While the email sought to obtain information about how IDOT's confidentiality policy applied to the Anderson based on his status as an IDOT employee, the inquiry relates in no way to Anderson's official or unofficial duties and responsibilities as a Technical Manager VII and Bureau Chief of IDOT's Bureau of Electrical Operations. Furthermore, while Anderson certainly had a stake in the scope and reach of IDOT's confidentiality policy, that stake did not relate to his employment but rather to IDOT employees' ability, as private "citizens and constituents," to contact their elected officials.

Nevertheless, the 2007 email does not enable Anderson to defeat summary judgment because the record is devoid of evidence that his question regarding IDOT's confidentiality policy was a motivating factor in the decision to terminate his employment. The Court recognizes that the timing of Anderson's January 2008 unfavorable performance evaluation, which covered the period beginning October 1, 2006 and ending November 30, 2007, coincided with Anderson's email to Schanzle-Haskins. However, while suspicious timing may in some cases yield an inference of retaliatory intent, *See Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012); *Kodish*, 604 F.3d 490, 501 (7th Cir. 2010), without more, the temporal proximity between Anderson's communication to Schanzle-Haskins and his first unfavorable evaluation is insufficient to support the inference that the email motivated his negative review, much less his

termination nearly two years later. *See, e.g., Coleman*, 667 F.3d at 861 (interval of a few months might be evidence of a causal nexus if there is corroborating evidence of retaliatory motive); *Benuzzi v. Bd. of Educ.*, 647 F.3d 652, 666 (7th Cir. 2011) (two-month time frame too long to support inference of causality); *George v. Walker*, 535 F.3d 535, 539 (7th Cir. 2008) (twenty-month gap between speech and action too long to support, by itself, an inference of causal connection). Thus, even assuming his First Amendment claims based on protected speech were not waived, Anderson has not met the requirements to establish a *prima facie* case on that basis.

Because Anderson has not met his burden of establishing a *prima facie* case under the First Amendment, the Court does not reach the issue of whether the retaliatory motive was a necessary condition for his termination.

## II.     Count II – Common Law Writ of Certiorari

Count II of Anderson's First Amended Complaint is a petition for writ of certiorari pursuant to Illinois state law seeking review of IDOT's decision to terminate him. It is undisputed that Count II arises from the same nucleus of operative facts as Anderson's First Amendment claim. However, "[w]hen all federal claims have been dismissed prior to trial, the principle of comity encourages federal courts to relinquish supplemental jurisdiction pursuant to § 1367(c)(3)." *Hansen v. Bd. of Trustees of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 607 (7th Cir. 2008); *see also Al's Service Center v. BP Products North America, Inc.*, 599 F.3d 720, 727 (7th Cir. 2010) ("When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims."); *Williams v. Aztar Ind. Gaming Corp.*, 351 F.3d 294, 300 (7th Cir. 2003) (where "the sole basis for invoking federal jurisdiction is non-existent … the federal courts should not exercise supplemental jurisdiction over his remaining state law claims").

34

There are three exceptions to this general rule: (1) when the filing of the state claims is barred by the statute of limitations; (2) where substantial judicial resources have already been expended on the state claims; and (3) when it is clearly apparent how the state claim is to be decided. *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007) (citing *Wright v. Associated Ins. Companies, Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994), and *Williams Electronics Games, Inc. v. Garrity*, 479 F.3d 904, 906 (7th Cir. 2007)).   None of these exceptions apply to Anderson's common law claim for writ of certiorari.   First, because Count II is to be dismissed on jurisdictional grounds, Illinois law gives Anderson one year to refile in state court. *See* 735 ILCS 5/13-217 ("[If] the action is dismissed by a United States District Court for lack of jurisdiction, … then, whether or not the time limitation for bringing such action expires during the pendency of such action, the plaintiff … may commence a new action [in state court] within one year or within the remaining period of limitation, whichever is greater, after … the action is dismissed by a United States District Court for lack of jurisdiction …."); *Davis v. Cook County*, 534 F.3d 650, 654 (7th Cir. 2007).

Next, although the Court has devoted substantial resources to the disposition of Anderson's federal claim, the Court has not delved into his state law claim.   In order to address Count II, the Court must review the record submitted by IDOT in support of its decision to terminate Anderson and determine "whether the record contains any evidence which fairly tends to support the agency's findings." *See Maddox v. Williamson County Bd. of Commissioners*, 475 N.E.2d 1349, 1354 (Ill. App. Ct. 1985) (citations omitted).   Here, the Court did not reach the issue of whether the Defendants had legitimate non-political reason for terminating his employment.   Furthermore, even if Anderson had presented sufficient evidence to shift the burden to the Defendants, the Court's resolution of Anderson's First Amendment claim would

"not reach issues fully dispositive of [his] pendant state claim[s]." *Williams*, 509 F.3d at 404; *see, e.g., Davis*, 534 F.3d at 650 (no substantial judicial resources committed where federal claims dismissed at summary judgment phase). A finding by this Court that Anderson's political affiliation was a motivating factor in the Defendants' decision to terminate him would not have been dispositive of "whether the record contains *any evidence* which fairly tends to support [IDOT's] findings" that Anderson was insubordinate, unprofessional, or disruptive to a degree sufficient to support a determination that IDOT's decision was not "palpably or manifestly against the weight of the evidence" as required under Anderson's common law cause of action. *See Maddox*, 475 N.E.2d at 1354 (Ill. App. Ct. 1985) (citations omitted); *cf. Wright*, 29 F.3d at 1251 ("If the district court, in deciding a federal claim, decides an issue *dispositive of a pendent claim*, there is no use leaving the latter to the state court.") (emphasis added); *see, e.g., Patrick v. City of Chicago*, 662 F.Supp.2d 1039, 1068 (N.D. Ill. 2009) (finding that "although the state and federal claims arise out of the same factual scenario, the legal analysis is very different and the fact that the Court has determined that Plaintiff's constitutional claims cannot survive summary judgment says very little about the proper disposition of state law claims asking the Court to issue a writ of certiorari …"). Accordingly, this Court's resolution of Anderson's federal claim does not make "clearly apparent" how the common law claim for writ of certiorari should be resolved. *Williams*, 509 F.3d at 404; *see also Wright*, 29 F.3d at 1251 (disposition of pendent state law claims appropriate "when it is absolutely clear how the pendent claims can be decided").

Finding no justification to depart from the general rule requiring dismissal of supplemental state law claims in these circumstances, the Court declines to exercise

supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367(c)(3).

## CONCLUSION AND ORDER

For the reasons stated, Defendants' Motion for Summary Judgment with respect to Count I is granted. The Court chooses to relinquish its supplemental jurisdiction over Anderson's common law claim for writ of certiorari. Accordingly Count II is dismissed without prejudice and with leave to re-file in state court.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date:  August 2, 2013